Filed 9/4/20  P. v. Sims CA1/1
(opinion following transfer from Supreme Court)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>ANTHONY SIMS,<br><br>        Defendant and Appellant. | A155339<br><br>(Alameda County<br>Super. Ct. No. 604145A) |

Defendant Anthony Sims participated in a gun battle that caused the death of an innocent bystander, Chyemil Pierce, in front of her two young children.  A jury found him guilty of second degree murder and found true various firearm enhancements, including that he personally and intentionally discharged a firearm causing great bodily injury or death.  At the prosecutor's request, the trial court struck the firearm enhancements, and Sims was sentenced to 15 years to life in prison.

On appeal, Sims claims that various prosecutorial errors warrant reversal of his conviction.  He also claims that his trial counsel rendered ineffective assistance by failing to request an ability-to-pay hearing before the trial court imposed a $10,000 restitution fine and $10,000 parole revocation restitution fine.  We affirm.

1

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

Sims was tried with three other participants in the gun battle. We affirmed the convictions of two of his co-defendants, Alex Davis and Michael Stills, Jr., in a previous opinion. (*People v. Davis* (Mar. 27, 2019, A152259 & A153136) (*Davis*) [nonpub. opn.].) Our recitation of the facts in the following subheadings A through I is quoted from that opinion. As set forth in more detail below, the evidence tended to suggest that Sims shot at the third co-defendant, Jerry Harbin; was shot in the chest himself; and escaped from the scene as Davis, who fired the shot that killed Pierce, shot toward him and another participant, Julian Ambrose.

"*A.      Third World and the Bottoms.*

"In March 2015, Pierce was killed near the intersection of 30th Street and Chestnut Street in West Oakland. The area is nicknamed 'Third World' after a rapper from there. Of the people charged with crimes in connection with Pierce's murder, several were associated with Third World: Shelton McDaniels, who hung out in a house at that intersection; Davis, who was friends with McDaniels and also hung out at the house; Jerry Harbin, who shared a half brother with McDaniels and also hung out in Third World, although he was not from that neighborhood; and Stills, who grew up around Third World and often hung out in that area as well.

"The other people charged were associated with another neighborhood of West Oakland known as 'the Bottoms': Joneria Reed; her son, Dijon Ward; a cousin of hers, . . . Sims, who was actually from East Oakland; and . . . Ambrose, who was friends with Ward.

"Despite the prosecution's attempts to paint the shootout as a battle between warring groups, little evidence suggested there was any tension

2

between the two neighborhoods at the time of the murder. To the contrary, several witnesses testified that the conflict that day grew out of personal disagreements. Indeed, as discussed further below, the evidence showed a complex web of friendships and other connections between the two groups.[1]

. . .

"B.  *Harbin and His Girlfriend Go to Third World.*

"On March 9, 2015, Harbin, who was the only one of the four defendants to testify, bought a used red Porsche Cayenne SUV. Around 3:30 p.m., he picked it up from the seller at 30th Street and Broadway in Oakland. He left the car he had driven there, a rental gray Buick Regal, and drove the Porsche to 28th Street to pick up his girlfriend.

"After getting his girlfriend, Harbin called McDaniels, whom he considered a brother. McDaniels was at a nearby liquor store, and Harbin headed there to show him the Porsche. While his girlfriend stayed in the car, Harbin got out and spoke to McDaniels, who was with Davis, a friend

---

[1] Sims, Harbin, Davis, and Stills were tried together in this case. After the jury indicated it was deadlocked on the murder charge against Harbin, he pleaded no contest to voluntary manslaughter, and he was sentenced to 13 years in prison in July 2017. Davis and Stills were convicted of second degree murder and various firearm enhancements, and later that year they were sentenced, respectively, to 40 years in life in prison and 16 years to life in prison. (*Davis, supra*, A152259 & A153136.) Sims, who was 19 years old at the time of the murder, was not sentenced until July 2018, to allow for time to make a record for a future youth offender parole hearing under *People v. Franklin* (2016) 63 Cal.4th 261.

The cases against McDaniels and Ambrose were still pending at the time of Sims's sentencing. "Ward pleaded no contest to being an accessory after the fact and received probation. Finally, Reed testified for the prosecution in this case under an agreement that if she was truthful, she would be allowed to withdraw her plea to murder and receive a six-year sentence for voluntary manslaughter." (*Davis, supra*, A152259 & A153136.)

3

nicknamed Goofy, and another friend Harbin did not know. McDaniels told Harbin that there was a group of 'maybe 15 to 20 women' in the Third World area who were 'trying to basically hang out and have a good time' with McDaniels and his friends. McDaniels invited Harbin to come, and Harbin responded that he would meet McDaniels there after taking his girlfriend to pick up the Buick.

"Meanwhile, Harbin's girlfriend spoke on the phone to one of her close friends. Based on the conversation, Harbin's girlfriend believed that her friend was going to get in a fight with Ward's girlfriend and that another friend, R.B., might also become involved. R.B. had dated Donald Ward, Ward's brother and Reed's son, until his murder a few months earlier. R.B. was in the beginning stages of a relationship with McDaniels, whom she continued to date after he went to jail for Pierce's murder.

"When Harbin returned to the Porsche and told his girlfriend they were going to get the Buick, she asked him if he could first take her to find R.B. Harbin had seen R.B. around 30th and Chestnut, where she lived, earlier that day, so he drove to that area. He testified that when he and his girlfriend arrived, there were 'a lot of women in the middle of the street,' including his younger cousin, who was best friends with R.B. The women were 'in an uproar,' and he 'could tell something was going on.' His girlfriend spotted R.B. and asked her to leave with them, but R.B. refused.

"C.     *The Fight Between Harbin's Girlfriend and Ward's Girlfriend.*

"Reed and her sister had driven to Third World earlier that afternoon to visit a friend. Ward's girlfriend, the mother of his child, subsequently arrived at 30th and Chestnut to get Reed's EBT card to buy groceries. Two of Ward's girlfriend's female cousins accompanied her. At the time they arrived, Davis, Stills, and McDaniels were in the area.

4

"Before Harbin and his girlfriend could leave after making contact with R.B., Ward's girlfriend approached the passenger's-side window of the Porsche and asked Harbin's girlfriend what she was looking at. Harbin's girlfriend responded, ' "I'm grown. I can look wherever I want," ' and they exchanged more words. Harbin's girlfriend testified that Ward's girlfriend did not like her because she had had a fling with Ward the previous year, but Ward's girlfriend denied ever 'hav[ing] issues over [Ward]' with the other woman.

"Harbin tried to drive away, but his girlfriend, whom he described as having an 'explosive' temper, jumped out of the Porsche while it was moving. She 'beeline[d] straight towards [Ward's girlfriend],' punched her, and grabbed her hair. Harbin's girlfriend was bigger than Ward's girlfriend, and witnesses agreed that Harbin's girlfriend was winning the fight.

"Several other women then joined the fight to help Ward's girlfriend. Among them were Reed's sister, both of Ward's girlfriend's cousins, and Harbin's cousin. R.B. saw Ward's girlfriend's younger cousin hit Harbin's girlfriend and intervened in an attempt to stop the fight, but she soon gave up in the chaos.

"Meanwhile, Harbin got out of the Porsche and also tried to stop the fight. He saw his cousin punching his girlfriend, who was pregnant but not yet showing, and said, ' "You know she pregnant. You wrong. What are y'all doing?" ' Several of the women were pulling his girlfriend's hair, and he tried to remove their hands from her head and pull her away from Ward's girlfriend.

"According to Ward's girlfriend, Harbin 'pushed people off of [his girlfriend], got violent with the girls,' including hitting Ward's girlfriend's younger cousin. Ward's girlfriend's cousins agreed with this characterization,

5

although the younger one allowed that Harbin was originally trying to break up the fight. Reed testified that as she was trying to stop the fight, Harbin 'shove[d]' her to the ground. Harbin admitted that he pushed Reed as he was 'breaking everyone up' but denied it was intentional.

"Reed testified that she expected one of the men present from the Third World group would help her up, 'since they were cool with [her deceased] son,' and she became angry when no one did. A neighbor who lived near 30th and Chestnut testified that she 'noticed a commotion' and then heard a female voice say, ' "You Third World niggas are some punk ass niggas," ' and refer to a woman's being pushed to the ground.

"Reed stated that after being pushed to the ground, she said to Harbin, ' "Why the fuck you put your hands on me?" ' She testified, 'I remember someone saying, "That's Donald mom." And the next thing I heard was [Harbin say], "Fuck you and your dead son." ' Ward's girlfriend and her cousins testified that they also heard this response. Harbin, however, denied saying anything to Reed about her son: '[S]he's saying that somebody said, "That's Donald's mom," that would mean as much to me as if somebody were to tell me you're Andrew's dad or you['re] Michael's mom. I don't know who Donald is. I don't know this lady at all. [¶] That was pure embellishment. That's something that she created after Ms. Pierce [died].' R.B. did not hear anyone say anything bad about her deceased boyfriend either.

"D.     *Harbin and His Girlfriend Leave.*

"After Reed fell, Harbin and his girlfriend got back into the Porsche. Harbin's girlfriend testified that she wanted to leave because she did not 'want to put [Harbin's] life in jeopardy over a girl fight.' Before they could drive away, Ward's girlfriend approached the passenger's-side window and tried to pepper spray Harbin's girlfriend, but nothing came out.

"According to Ward's girlfriend, Harbin then 'flashed' a handgun at her, at which point she backed away from the car. Her cousins also both testified that Harbin showed a gun. Harbin, a convicted felon, admitted that he was carrying a semiautomatic 1911 .45-caliber handgun at the time, but he denied showing it to Ward's girlfriend. When asked why he had a gun that day, he explained, 'It's Oakland. It's like NASCAR. You're gonna wear seatbelts. You're not looking to get into a crash, but it happens.'

"Harbin, who was upset with his girlfriend for fighting, dropped her back off on 28th, which was about six blocks away. He then drove the Porsche to his uncle's house on nearby Mead Street, left it parked there, and got a ride to 30th and Broadway so he could retrieve his Buick.

"Harbin testified that as he was driving the Buick, McDaniels called him and told him 'to come back [to 30th and Chestnut] basically and straighten all of this out.' Harbin explained that he did not drive the Porsche back to the area because he was already in the Buick, the Porsche had an alignment problem, and he 'was on probation and . . . didn't want to get pulled over in this car because [his girlfriend] had a fight in this car.' He testified that heading back to Third World, he thought he 'had got rid of the problem and . . . [was] coming back to fix whatever had happened.' He elaborated, 'It's a fight between two 19-year-old girls. Like, I'm not expecting anybody to be hurt behind it.'

"E.    Reed Calls Ward and Sims to the Scene.

"Harbin's girlfriend testified that before leaving 30th and Chestnut with Harbin, she heard Ward's girlfriend say, referring to Ward, ' "Call my baby daddy." ' According to Harbin's girlfriend, Reed then grabbed the phone

and talked to her son. Harbin's girlfriend and R.B. both heard Reed say something like, ' "This nigga put his hands on me." '

"Reed admitted that she called Ward and told him that someone had put hands on her, as well as that his girlfriend had been beaten up. Reed also admitted that Ward already knew she was in Third World and that she expected him to show up, even though she denied actually asking him to do so. Believing Ward might arrive, Reed also called Sims because she did 'not want[] [her son] to be alone.' Sims told her he was in East Oakland, which she testified made her think he would not come.

"Ward's girlfriend's younger cousin testified that meanwhile, McDaniels 'said something . . . like, "You bitches aren't from around here," ' and told her and her cousins to leave. Ward's girlfriend's older cousin heard him say that 'no one was gonna do anything to his brother,' apparently referring to Harbin, and both cousins saw him run into a house. The older cousin claimed she then saw him come back out holding a 'long gun.' Fearing that 'something bad was getting ready to happen,' she urged Ward's girlfriend and their other cousin to leave, but Ward's girlfriend refused. Her cousins left, and Ward's girlfriend walked to R.B.'s house across the street to get a towel for her face, which was bleeding.

"Shortly afterward, Ward, Sims, and Ambrose arrived at 30th and Chestnut. Ward was driving either a purple or blue Acura. Ward and McDaniels were friends, and both Reed and R.B. saw Ward speak to McDaniels. R.B. tried to talk to Ambrose, whom she had known for '[a] real long time,' so she could tell him 'what really happened, because [she knew] people already told him, like, [Reed] . . . got pushed and that was just stuck in his head that somebody pushed [Reed].' But when she called his name, Ambrose acted as if he was not 'trying to hear' her and did not respond.

8

*"F.    Harbin Returns, and the Shooting Begins.*

"R.B. testified, and Reed confirmed, that Reed's sister then yelled, ' "There that nigga go right there." ' R.B. saw Harbin driving down the street in a gray car and heard gunshots. Similarly, Ward's girlfriend testified that before dropping to the ground in R.B.'s house, she saw Harbin driving quickly down 30th and heard numerous gunshots. R.B. testified that she saw first Ambrose and then Sims shooting handguns toward Harbin's car. Reed also testified that before running away from the scene she saw Ambrose shooting toward a car, although she denied that Sims was even there.

"R.B. testified that she also saw Davis, who was the only defendant who had dreadlocks, shooting toward Ambrose and Sims. She could not remember what Davis's gun looked like. To impeach this testimony, Davis introduced evidence that in a police interview soon after the murder, R.B. identified him but specifically denied seeing him shoot.

"Harbin testified that as he was pulling in to park near the house where McDaniels normally hung out, he heard gunshots. One of the shots hit his car, and he realized that he was being targeted. He quickly turned his wheel to try to drive away, but 'a bullet hit [him] in the back' and made him 'inadvertently . . . jerk the wheel,' causing his car to crash into a house and turning him perpendicular to the street. A bystander confirmed that he saw Harbin's car crash and get ' "lit . . . up." '

"Harbin tried to exit from the passenger's side of his car, away from where the gunshots were coming, but the door was blocked by the house's staircase. When he was unable to exit the car, he 'pulled a gun out from [his] hip and [he] fired through [his] car door' toward 'the direction of the bullet that hit [him],' but at a downward angle because his arm 'locked up' when he tried to lift it. Harbin claimed that he shot in self-defense, explaining that he

9

could not see who was shooting but could hear the shots getting louder.  He testified, '[I]n my mind, they running up on my car and they about to finish me off.'  He denied that he would have gone back to Third World had he known he was in danger, saying, 'These women were hanging with my brother [McDaniels], they were hanging with my cousin.  No[]where in my mind was I thinking that they were going to try to have me murdered.'

"After Harbin emptied his gun, the gunshots continued.  He looked outside and saw McDaniels, who had positioned himself between Harbin and the intersection of 30th and Chestnut.  McDaniels was shooting a Glock with an extended magazine toward the intersection, apparently in defense of Harbin, and Harbin later concluded that the louder shots he had interpreted to mean that someone was approaching his car were actually shot by McDaniels.  Harbin testified that he backed up his car and drove away as McDaniels continued to shoot the Glock.

"*G.  Stills Gives a Rifle to McDaniels.*

"The police interviewed Stills a few weeks after the murder, and portions of his statement were played for the jury.  He said that when McDaniels first returned to 30th and Chestnut after the fight between the women 'and they was making phone calls,' McDaniels told him there was a rifle in the backseat of his car.  At that point, Stills, who had a preexisting injury to his arm, told McDaniels, 'I only got one arm.  Like, how am I gonna shoot that mother[]fucker?'

"Later, during the shootout, Stills saw McDaniels shooting a Glock, which jammed.  After the Glock jammed, McDaniels asked Stills to 'get his rifle out his car,' a white Mercedes-Benz, and Stills admitted that he 'grabbed [it] and . . . ran to Chestnut and . . . handed it to [McDaniels].'  Stills then saw McDaniels point the rifle down Chestnut and shoot toward Ambrose.

10

According to Stills, Ambrose was running the other direction while shooting behind him, toward Stills and McDaniels.

> . . .

> "H.      *Pierce Is Killed and the Shooters Flee.*

> "A contractor who was working at Pierce's house that day testified that he saw Pierce arrive home in her car with her children.  As she was parking, he heard gunshots, and he dropped to the ground.  A neighbor of Pierce's testified that after hearing several gunshots, she looked outside and observed Pierce 'yelling at her children to run.'  The neighbor then saw Pierce fall face-first on the ground as she was following her children up the driveway.  It was later determined that Pierce died from a single gunshot to the head and neck.

> "When the contractor looked outside, he saw a vehicle drive by and two men, one bleeding from the chest, 'chasing after the car.'  Similarly, Pierce's neighbor testified that after Pierce collapsed she saw two '[v]ery young' males run down the street with black pistols their hands.  They ran toward a dark blue Audi station wagon, where another man was 'waving for them to hurry and get in,' and then all three left in the car.

> "Another bystander who was around 28th and Chestnut testified that she heard dozens of gunshots that sounded like 'a wild west shootout.'  The shots originally seemed like they were coming from about a block away but then got closer.  She looked out the window and saw a dark 'newer model car . . . [l]ike an Audi' driving down Chestnut, away from 30th.  Two men, one of whom had been shot in the chest and was holding a handgun, were running behind the car, which had another person 'already kind of half-in/half-out of the passenger seat.'  The bystander also saw a third man with dreadlocks moving down the sidewalk while pointing a handgun in the direction the two other men were running.

11

"A woman who lived at 30th and Chestnut testified that she heard several gunshots and saw 10 to 15 men standing in the intersection, some of whom were shooting down Chestnut. Three of the men who were shooting had just come from the vicinity of a white Mercedes-Benz. After retreating toward the back of her house, she looked outside again, and the same three men still appeared to be shooting. According to her, one of them had a rifle, one had a 'larger handgun with [an] extended clip,' and one had a 'regular handgun.' She thought that the man holding the rifle had dreadlocks. [Footnote omitted.] The men then drove away in a light-colored car.

"I.      *The Aftermath and the Physical Evidence.*

"Harbin's girlfriend testified that she returned to Third World with two other women, intending '[t]o go fight the girls that jumped [her].' As they arrived, they 'heard a lady was killed or unconscious,' and they saw Pierce lying on the ground. Harbin's girlfriend walked up Chestnut and saw Ambrose lying on the side of a house a few doors down from Pierce's, 'bleeding really bad.' Harbin's girlfriend had grown up with Ambrose and characterized him as 'like a little cousin to [her],' and she was recorded yelling at police officers to help him. Sims had been shot as well and also eventually arrived at the hospital.

"Meanwhile, as Ward's girlfriend's cousins were trying to return to the scene, they heard gunshots. They saw McDaniels and another person driving away in Ward's Acura, which the older cousin found 'suspicious' since Ward had just bought it from her sister. Stills also told the police that after the shooting was over, he saw McDaniels steal Ward's car and leave the scene.

"Harbin, who was shot in the back, managed to return to his uncle's house, and his Buick was later towed from Mead. Its rear window had been shot out from outside, and it had several holes and ricochet marks caused by

12

other shots fired from both inside and outside the vehicle. Consistent with Harbin's testimony that he had fired a .45-caliber handgun, a .45-caliber shell casing was recovered from the floorboard behind the driver's seat, and another .45-caliber shell casing shot by the same gun was found underneath the car. Harbin testified that the day after the murder he traded the gun he had shot for a 9mm-caliber Taurus handgun, which he had when he was arrested, and his .45-caliber gun was never recovered.

"The evidence showed that at least five different weapons in addition to Harbin's .45-caliber handgun were fired at the scene. First, a Springfield Armory semiautomatic .45-caliber pistol, which had Sims's blood on it, and two boxes of .45-caliber ammunition were recovered from Reed's sister's house. A cluster of five casings discharged by that gun were recovered near 30th and Chestnut.

"Second, a Bersa mini Firestorm .40-caliber pistol, which had Ambrose's blood on it, was recovered near the driveway where Ambrose was found. Nine casings from the Firestorm were found at the scene.

"Third, a Glock .40-caliber pistol that fired 20 of the casings found at the scene was recovered from the house of a second girlfriend of Harbin's. This girlfriend testified that four days after the murder, she found the gun hidden in her reclining chair and placed it in a bag in the closet. The Glock had DNA from three people on it, including Harbin. Implying that the Glock belonged to McDaniels, Harbin testified that he handled the weapon when hiding it at his girlfriend's house but that it was not his.

"Fourth, four .223-caliber casings fired by the same gun were recovered at the scene. A criminalist testified that an AR-15 assault rifle is the most common type of gun used to shoot such cartridges. No AR-15 or other similar gun was ever recovered, but boxes of .223-caliber ammunition were also

13

recovered from Harbin's second girlfriend's house. The girlfriend testified that within a few days of the murder, Harbin and McDaniels arrived at her house. They had a long, black gun on the backseat floor of their car, and she refused to let Harbin bring it in the house. Harbin testified that he did not know what ultimately happened to this weapon, which he did not know McDaniels had until after the shooting.

"Finally, a single .38/.357-caliber bullet shot by an unrecovered firearm was found a couple feet from Pierce's head and had her DNA on it. The criminalist testified that the bullet was of a caliber one "would normally associate with a revolver," a type of gun that does not expend casings. The evidence tended to suggest, by process of elimination, that Davis fired this gun."

### J. Procedural History.

Sims was charged with one count of murder with the accompanying allegations that he personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing death.[2] He was also charged with the attempted murder of Harbin and one count of unlawful firearm activity.[3]

---

[2] The murder charge was brought under Penal Code section 187, subdivision (a), and the firearm enhancements were alleged under Penal Code sections 12022.5, subdivision (a), and 12022.53, subdivisions (b) and (g) (personal use of firearm), section 12022.53, subdivision (c) (personal and intentional discharge of firearm), and sections 12022.7, subdivision (a), and 12022.53, subdivision (d) (personal and intentional discharge causing death). All further statutory references are to the Penal Code.

[3] The attempted murder charge was brought under sections 187, subdivision (a), and 664, with firearm enhancements alleged under the same statutes as were those attached to the murder charge. The charge of unlawful firearm activity was brought under section 29805, based on a 2014 conviction under section 25400 for carrying a concealed firearm.

Before the presentation of evidence began, the trial court granted the prosecution's motion to dismiss the attempted murder charge, and the jury was instructed not to decide that count. After the close of evidence, Sims pleaded no contest to unlawful firearm activity. The jury then convicted him of second degree murder and found true the firearm allegations.

At sentencing, the trial court granted the prosecution's motion to strike the firearm enhancements in the interest of justice. The court sentenced Sims to 15 years to life in prison for murder and a concurrent term of two years in prison for unlawful firearm activity. Among other monetary charges, the court also imposed a $10,000 restitution fine and imposed and stayed a $10,000 parole revocation restitution fine.

## II.
### DISCUSSION

#### A. *Sims Forfeited His Claims of Prosecutorial Error, and He Fails to Demonstrate that the Forfeitures Resulted from Ineffective Assistance of Counsel.*

Sims claims that various prosecutorial errors during closing argument require reversal of the murder conviction. Specifically, he claims that the prosecutor erred by (1) contrasting him and the other defendants on trial with Reed and Ward; (2) using an improper hypothetical; and (3) making arguments that reduced the burden of proof.

We conclude that Sims forfeited his claims by failing to object to the prosecutor's arguments on the grounds he now raises. In addition, Sims fails to show that the omission of such objections constituted ineffective assistance of counsel. Finally, to the extent he did preserve certain claims, he cannot demonstrate prejudicial error. Accordingly, he is not entitled to relief.

15

### 1. Additional facts

Sims's claims revolve around the prosecutor's general theme that the defendants on trial had a defense of "not our fault." In his initial closing argument, after discussing at length the defendants' claims that they were not to blame for Pierce's death, the prosecutor summarized, "It's none of their fault. That's what they're asking you to find, ladies and gentlemen. They're asking you to find that none of them are responsible. None of them are responsible for causing this shootout a block away from McClymonds High School." Sims's trial counsel objected that "that's not what I'm going to ask," and the trial court overruled the objection on the basis that "this is argument." Counsel insisted, "So he can't tell them what I'm going to ask," and the court responded, "It's argument, [counsel]," and told the prosecutor to continue.

The prosecutor returned to this theme numerous times throughout closing argument, including on rebuttal. For example, after discussing the legal principles governing the case, he stated, "In lay terms, this is not a self-defense case. It's not. That's what they'd have you believe, though, so that none of them are responsible. Chyemil Pierce's death? Oh, well." Similarly, in arguing that "responsibility attach[ed]" once the defendants began preparing for the confrontation between the two groups, the prosecutor said, "Getting your arsenal ready, making preparations. Right? You don't get to say it's not my fault. Because in the end, no matter what fancy legalese is used, that's their defense boiled down to the basic premise: It's not my fault. Mr. Sims, 'It's not my fault she's dead.' Mr. Davis, 'It's not my fault she's dead.' Mr. Harbin, 'It[] ain't my fault.' Mr. Stills, 'It ain't my fault. I didn't even fire a gun.' [¶] Again, no matter how fancy the words are, that's the defense. It's not my fault."

The prosecutor also contrasted Reed and Ward, who he argued had accepted responsibility by entering pleas and were remorseful, to the defendants standing trial. For example, the prosecutor argued:

> "We know that Joneria Reed has pled guilty. We know she pled guilty to a murder. The terms were very clear; right? And she did it because there's a benefit to her. There's no getting around that; right? She comes and tells the truth at this trial and the next, and it gets reduced to six years on a manslaughter; right?
>
> "How is Ms. Reed different than the gentlemen here? Her testimony is . . . I called men to come and defend my honor. I didn't tell them to shoot. I wouldn't do that.
>
> "You saw when she's up there crying. She's crying because she feels bad about what happened. That's how she's different.
>
> "But is she liable? Does she have responsibility? Yes. Has she accepted responsibility? Yes. But it's none of their fault.
>
> "Dijon Ward, charged with [being] an accessory. He's resolved his case; all right? But again, 'It's not my fault.' "

The prosecutor also raised this contrast on rebuttal, arguing, "Joneria Reed has accepted her responsibility. You've learned Dijon Ward has already pled to [being] an accessory; he's accepted his responsibility. [The] position [of the defendants on trial] is we're not responsible, which is what I told you in the beginning of the case and in the beginning of arguments this case was about. It's not our fault."

The prosecutor acknowledged at sentencing, however, that Sims "ha[d] always expressed remorse for his role in this crime. [¶] He expressed remorse expressly as well as implicitly when he wanted to resolve this case early on. Unfortunately for Mr. Sims, given the status of the case and everyone's involvement, I indicated to him that I would not be able to allow him to

17

resolve his case, even though again he had expressed remorse from the beginning." Because Sims "never shot anyone and . . . wasn't the one who was responsible or directly responsible for Chyemil Pierce's death," the prosecutor moved to strike the firearm enhancements in the interest of justice under section 12022.53, subdivision (h). The trial court granted the motion, stating, "I think it's a magnanimous gesture on behalf of the People," which "effectively removed that 25-year-to-life sentence" that would have otherwise been imposed under section 120225.3, subdivision (d), as well as any shorter terms for the other enhancements.

Sims also objects to the prosecutor's use of two hypotheticals during closing argument. The first involved a scenario, which originally came up in opening statements, in which three boys who have a preexisting conflict prepare for and get into a snowball fight during which a car window is broken. In his closing argument, the prosecutor returned to this scenario, stating that he thought it was "a good example . . . because it allows you to ask the question: When does responsibility begin; right? What is the tipping point; right?" Acknowledging that "it's a very simple analogy . . . [and] a little bit playful," the prosecutor argued that the defendants were in a similar position to the boys because their stance was that "despite the preparation, despite everything that came before, it's none of their fault. None of them are responsible."

The prosecutor raised the second hypothetical on rebuttal, in response to Davis's counsel's hypothetical involving shooting into a room full of people. The prosecutor argued:

> "Let's assume that [Davis's attorney] and I . . . are going to have a shooting right here. We're not friends. We have a strong dislike. He stands that way. I stand here. And all of you are present and we're about to shoot. What are all of you gonna do? Run, duck, hide.

"Because is it foreseeable that one of you might get hit? Absolutely. Absolutely. What about if we're shooting at that back corner? Is everybody gonna feel safe? Absolutely not. Absolutely not. Is it foreseeable that an innocent person might get hit when there's a shootout? Oh, c'mon, the answer's simple. It's yes."

Returning to this hypothetical later, specifically in relation to Sims's arguments "about proximate cause and intervening superseding causes," the prosecutor said,

"[M]e and [Davis's attorney] have a shootout in that corner. I guarantee you guys aren't going to be eating popcorn watching because you're going to know something—'It's time for us to go.'

"The only other way out of here is that door, which we know is locked. That door, which you're not going to go to because we're going to shoot out over there. So you're going to all [be] piling over here at this door.

"But [Davis's attorney, Sims's attorney, Harbin's attorney, and Stills's attorney], their position is, if there's a shootout right there, it's not foreseeable that any of you are going to get hit. If we decide we're going to show up and have a shootout, it's not foreseeable that poor citizens who are literally right across the courtroom from us are going to get hit. That wouldn't be our fault. If we miss each other, oh, well. You should charge us with trying to kill each other. Not with one of the jurors who may get hit. It's not our fault."

Sims's counsel objected that "[t]his [was] improper argument involving the jury and setting up a situation in this courtroom," and the trial court overruled the objection.

### 2. General legal standards

Prosecutorial "error occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.] Federal constitutional error occurs only when

19

the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854.)  When a claim of prosecutorial error " 'focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960 (*Smithey*).)

"[T]o preserve a claim of prosecutorial misconduct for appeal, ' " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943 (*Hoyt*).)  The requirement is meant to " ' " " 'encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had,' " ' " and it is " ' " " 'unfair to the trial judge and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.' " ' " (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1081, quoting *People v. Saunders* (1993) 5 Cal.4th 580, 590, italics omitted.)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)  To prevail on a claim of ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient," such that "counsel was not functioning as the 'counsel' [constitutionally] guaranteed," and "that the deficient performance

prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) Thus, a defendant must demonstrate both that (1) "counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms" and (2) there was "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

Generally, "in the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." (*People v. Frierson* (1991) 53 Cal.3d 730, 749.) In other words, because "[t]he appellate record . . . rarely shows that the failure to object was the result of counsel's incompetence . . . , such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*Lopez*, *supra*, 42 Cal.4th at p. 966.) Thus, reversal on direct appeal for ineffective assistance of counsel is warranted only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

3.      Contrasting the defendants on trial to Reed and Ward

Sims argues that the prosecutor erred in several respects by contrasting him and the other defendants to Reed and Ward. First, Sims complains that by doing so, the prosecutor improperly "argued an implication

21

he knew to be untrue," that Sims had not expressed remorse or accepted responsibility for Pierce's death. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1105 [error to lead jury to believe fact prosecutor knows is untrue].) Second, Sims argues the line of argument "invited jurors to penalize [his] reliance on his legal rights" by going to trial and electing not to testify. (See *Griffin v. California* (1965) 380 U.S. 609, 615 [error for prosecutor to comment on defendant's decision not to testify]; *United States v. Smith* (11th Cir. 1991) 934 F.2d 270, 275 [error for prosecutor to state that defendant failed to take responsibility for his actions whereas his co-defendants entered pleas].) Third, Sims argues that in comparing him to Reed and Ward, the prosecutor improperly commented on facts not in evidence, including Sims's supposed lack of remorse. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 906 [prosecutor cannot base argument on facts not in evidence]; *People v. Boyette* (2002) 29 Cal.4th 381, 434 [generally error to comment on nontestifying defendant's courtroom demeanor].) And finally, Sims claims that the prosecutor improperly implied that he was guilty by association with Reed and Ward. (See *Lopez*, *supra*, 42 Cal.4th at p. 967 [error to invite finding of guilt by association].)

We agree with the Attorney General that Sims forfeited his arguments by failing to object on any of these grounds below. Sims contends that once the trial court overruled his objection to the prosecutor's claim that the general defense was "not our fault," any further objections would have been futile. Although acknowledging that he "did not specifically object to the prosecutor's arguments regarding Reed's and Ward's acceptance of responsibility," Sims claims that "the error is preserved for review because it [was] part and parcel" of the prosecutor's more general theme about the defendants' position.

Sims's objection was merely that his defense was not "it's not my fault," and there were no objections whatsoever to the prosecutor's invocation of Reed and Ward as contrasts to the defendants on trial. Thus, the issues Sims now raises were not presented to the trial court. Moreover, he did not ask for the jury to be admonished, and he does not claim on appeal that any of the improper aspects of the prosecutor's argument could not be cured by further instruction. As a result, his claims are forfeited. (See *Hoyt, supra*, 8 Cal.5th at pp. 942–943.) We disagree with Sims that the forfeiture question is "close and difficult," and we decline to exercise our discretion to consider his claims on the merits.

Nor has Sims demonstrated that his trial counsel rendered ineffective assistance by failing to object. Sims fails to grapple fully with the requirement that where, as here, the record is silent about counsel's reasons for not objecting, a defendant must show "there simply could be no satisfactory explanation." (*Mai, supra*, 57 Cal.4th at p. 1009.) Sims cursorily asserts, as to all the claims of prosecutorial error, that "[t]here can be no tactical reason for counsel to fail to adequately object," particularly given that counsel did object to related issues twice, and that the failures here were "a matter of competence, not tactics." In his reply brief, Sims clarifies that "[w]hile deciding *whether* to object may in some cases be tactical, the adequacy of an objection is a matter of competence."

Sims's counsel's objections to the characterization of the defendants' general defense and the shootout hypothetical were not tied to any mentions of Reed and Ward, however, and we thus cannot conclude that these objections were merely inadequate attempts to challenge the comparison of Sims to the defendants who entered pleas. And as the case law recognizes, there are a variety of tactical reasons defense counsel may decide not to

23

object even if the objection has merit. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [rational not to object to avoid calling attention to prosecutor's remarks]; *People v. Frierson*, *supra*, 53 Cal.3d at p. 749 [rational to counter prosecutor's point with argument instead of objecting].) We also note that none of the attorneys for the other defendants on trial objected to the discussion of Reed and Ward, further suggesting that the omission was within the range of competent representation. In short, Sims fails to demonstrate that his counsel could have had no legitimate tactical reason for not objecting to the prosecutor's arguments involving Reed and Ward.

Moreover, even if Sims's counsel should have objected to at least some of these arguments (as the Attorney General apparently concedes), the omission was harmless. The jury was instructed that it "must not be biased against [a] defendant just because he has been arrested, charged with a crime, or brought to trial," and that "[a] defendant has an absolute constitutional right not to testify." Indeed, the jury was specifically warned not to "consider, for any reason at all, the fact that defendants Sims, Stills, and Davis did not testify." The jury was also instructed that it must follow the law as explained by the trial court, not counsel, and that counsel's remarks in closing arguments are not evidence. Sims does not challenge the correctness of these or any of the other instructions given, including those on what he characterizes as "[t]he only real questions before the jury"—whether he fired in defense of himself or Ambrose and whether he proximately caused Pierce's death. Thus, even if the jury might have perceived the prosecutor's comments about Reed and Ward as an invitation to convict Sims on an improper basis, the instructions adequately dispelled that risk. In sum, even if Sims's counsel's performance had been deficient, there is no "reasonable probability that . . . the outcome of the proceeding would have been different"

24

had counsel objected to the challenged remarks. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

### 4. The shootout hypothetical

Sims also claims that the prosecutor's shootout hypothetical was improper because it " ' "invite[d] an irrational, purely subjective response" ' " by "[a]sking jurors to put themselves in the place of a victim." (Quoting *People v. Redd* (2010) 48 Cal.4th 691, 742.) He also objects that the hypothetical "significantly strayed from the facts of the case" by involving a closed courtroom from which there was no escape, thus "amplif[ying] the fear jurors would feel."

The parties dispute whether Sims preserved this claim. Although acknowledging that Sims eventually objected to the hypothetical, the Attorney General points out that the prosecutor started to develop it earlier without objection. We need not resolve the issue because, even assuming that the claim was preserved, it fails on the merits.

Sims complains that the hypothetical improperly invited the jurors to put themselves in the place of a victim, citing several decisions in which such rhetoric was deemed prosecutorial error. In those cases, however, the prosecutors focused on the actual victims' experiences, explicitly asking the jurors to imagine themselves in the place of the victims (or, in one case, the victim's mother). (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [victim's mother]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1192; *People v. Simington* (1993) 19 Cal.App.4th 1374, 1378–1379.) As our colleagues in Division Two of this court have explained, this "tactic of advocacy . . . [is] universally condemned across the nation . . . because it is a blatant appeal to the jury's natural sympathy for the victim." (*Vance*, at p. 1188.) Here, in contrast, the

25

hypothetical's primary focus was foreseeability, not the experience of Pierce (or any other bystander during the actual crime). Thus, the hypothetical is not comparable to the direct appeals to jurors' sympathy that are typically disallowed. Given this distinction, we perceive no " 'reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Smithey*, *supra*, 20 Cal.4th at p. 960.)

Even if the prosecutor's use of this hypothetical was improper, it did not cause prejudice to Sims. As the Attorney General suggests, the hypothetical "did not compare in intensity and emotion" to victim-sympathy arguments that have been held harmless in other cases, including in some of the decisions Sims cites. (See, e.g., *People v. Stansbury*, *supra*, 4 Cal.4th at p. 1057; *People v. Fields* (1983) 35 Cal.3d 329, 361–363; *People v. Simington*, *supra*, 19 Cal.App.4th at pp. 1378–1379.) Further reducing any risk that the jurors would respond emotionally, discussion of the hypothetical comprised a small portion of the prosecutor's closing arguments (see *Stansbury*, at p. 1057), and the jury was instructed not to "let bias, sympathy, prejudice, or public opinion influence [its] decision," including any "bias for or against the witnesses, attorneys, defendant[s] or alleged victims." (See *People v. Rich* (1988) 45 Cal.3d 1036, 1089–1090.) In short, we conclude there is no reasonable likelihood that Sims would have obtained a more favorable result had the prosecutor not used the shootout hypothetical. (See *People v. Daveggio and Michaud, supra*, 4 Cal.5th at p. 854.)

     5.    The arguments purportedly reducing the burden of proof

Sims next contends that "[t]he prosecutor's 'it's not my fault' refrain" and use of the snowball-fight and shootout hypotheticals "oversimplified and trivialized" the issue whether his actions proximately caused Pierce to die and reduced the burden of proof "by suggesting that acquittal was not

warranted unless the defendants were entirely blameless with respect to [her] death."

Sims objected to both the prosecutor's first invocation of the "it's not my fault" defense and the shootout hypothetical, but he did not do so on the basis that the prosecutor's remarks effectively lessened the burden of proof. In addition, he did not ask for the jury to be admonished, and he did not object to the snowball-fight hypothetical at all. Nor does he argue that the prosecutor's alleged errors were such that they could not be cured by further instruction. As a result, this claim is forfeited, and we decline to exercise our discretion to review it on the merits. (See *Hoyt*, *supra*, 8 Cal.5th at pp. 942–943.)

Sims's claim that any forfeiture resulted from ineffective assistance of counsel also fails. Again, Sims does not develop his brief assertion that any reasonably competent attorney would have adequately objected to the challenged arguments. He does cite *Centeno*, in which the Supreme Court held that the defendant's counsel was ineffective for failing to object when the prosecutor purported to illustrate the reasonable-doubt standard by showing a picture of California, describing witness statements about the state that were partially inaccurate, and suggesting the jurors should look at the whole of the evidence to reach a " 'reasonable' " determination. (*Centeno*, *supra*, 60 Cal.4th at pp. 665–666, 675–676.) The Court determined that the hypothetical, which had nothing to do with the facts of the case and relied on the jurors' outside knowledge, was improper because it both oversimplified the jury's task and reduced the People's burden of proof. (*Id.* at pp. 670–671.) The Court concluded that counsel could have had no reasonable tactical purpose for failing to object, because the error "[struck] at the most fundamental issue in a criminal case"; the image of California was "too

27

powerful and pivotal to address as irrelevant or trivial argument"; and the prosecutor presented it in rebuttal, meaning defense counsel had no opportunity to respond to it. (*Id.* at pp. 675–676.)

The *Centeno* hypothetical is not analogous to the comments at issue here, which did not explicitly address the burden of proof. As to the "it's not my fault" line of argument, that was essentially what Sims's defense was: He should not be held legally responsible for Pierce's murder because he did not proximately cause her death (or, if he did, he shot in defense of himself or Ambrose). We agree with Sims that an acquittal is not equivalent to a finding of innocence, meaning that the jury could decide to acquit even if it believed he bore some moral responsibility for Pierce's death. (See *People v. Lloyd* (2015) 236 Cal.App.4th 49, 62–63.) But the prosecutor's characterization of the defense did not misstate the law on this point or any other point related to the burden of proof. (Cf. *id.* at p. 62 [prosecutor erred by equating a finding of self-defense to a determination " 'the defendant's conduct was absolutely acceptable' " and stating that " 'not guilty . . . means you didn't commit a crime' "].) As such, Sims's counsel could have reasonably decided not to continue objecting after his initial objection was overruled, especially because he had the opportunity to respond to the prosecutor's characterization of Sims's defense in his own closing argument. (Cf. *Centeno, supra*, 60 Cal.4th at pp. 675–676.)

The snowball-fight and shootout hypotheticals also did not incorporate misstatements of the law. In addition, unlike the hypothetical in *Centeno*, they were related to the facts of the case. True, as the prosecutor himself recognized, the snowball-fight hypothetical could be seen as somewhat trivial compared to the actual facts, and the shootout hypothetical also did not perfectly line up with those facts. We also agree with Sims that the

28

prosecutor made some statements that tended to oversimplify the jury's task, including by repeatedly dismissing the concept of proximate cause as "legalese." But such comments pale in comparison to explicit mischaracterizations of the reasonable-doubt standard, and we therefore cannot say that Sims's counsel could have had no tactical reason for failing to object to them. Counsel had the opportunity to respond to the prosecutor's downplaying of proximate cause in his own closing argument, and he could have reasonably elected not to challenge the hypotheticals more vigorously because they did not clearly reduce the People's burden of proof.

Finally, even if Sims's trial counsel should have objected to the prosecutor's characterization of Sims's defense, the hypotheticals, or related statements because there was some danger they would lead the jury to approach its task less rigorously, we conclude that the omission was harmless. Again, the jury was instructed to follow the law as explained by the trial court, not counsel, and that counsel's remarks in closing arguments are not evidence. The jury was given CALCRIM No. 240 on causation, CALCRIM No. 620 on causation in homicide cases, and a special instruction on proximate cause, the correctness of which Sims does not challenge. Sims's counsel addressed the issue of causation at length in his closing argument, including urging the jury to reject the prosecutor's " 'Snowballs-R-Us' approach to this case, which is if you throw a snowball, you're all guilty for whatever happens thereafter." Thus, the instructions and Sims's argument conveyed that the causation issue was more complicated than the prosecutor portrayed it. Indeed, during deliberations the jury sought clarification of the proximate-cause instruction, suggesting it took the issue seriously.

As for the reasonable-doubt standard more generally, there is no dispute that the jury was properly instructed on it. Sims's counsel also

29

explained the standard in closing, emphasizing the prosecution's burden in that regard. In fact, counsel specifically informed the jury that an acquittal "only means the prosecutor hasn't proven the charge. That doesn't mean that [Sims is] not guilty." Moreover, although counsel argued the causation issue to the jury, his primary strategy was apparently to seek a verdict of voluntary manslaughter on the grounds that if Sims fired shots that proximately caused Pierce's death, he did so when trying to defend himself or Ambrose. At the beginning of his argument, counsel stated, "I don't think [Sims] necessarily ought to be acquitted," and at the end, counsel concluded, "I submit to you on that on the evidence of this case, you should find Mr. Sims guilty of nothing more than manslaughter and to do so will be justice." Thus, counsel's own message suggested acquittal was not the appropriate verdict, further reducing the likelihood that the prosecutor's comments— including the hypotheticals that did not even bear on the self-defense issue— led to a harsher verdict than the jury would have otherwise reached. As a result, there is no reasonable likelihood that Sims would have obtained a more favorable result had counsel more fully objected to the challenged remarks. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

### 6. Cumulative error

Finally, we reject Sims's claim that reversal is required because the alleged prosecutorial errors were cumulatively prejudicial. Since we have concluded he forfeited all but one of his claims of prosecutorial error, and the remaining alleged error was harmless, the relevant question is whether there is a reasonable probability that, if not for the cumulative effect of his trial counsel's failures to object, he would have received a more favorable verdict. (See *Smithey*, *supra*, 20 Cal.4th at p. 1017.) As we have discussed, as to each claim "either counsel's performance was not deficient, because there was no

30

error, or [Sims] has failed to establish that he was prejudiced by any deficiency." (*Ibid.*)  As a result, reversal of the murder conviction for prosecutorial error or ineffective assistance of counsel is unwarranted.

### B. *Sims Cannot Demonstrate that His Counsel Rendered Ineffective Assistance by Failing to Request an Ability-to-pay Hearing.*

Sims also claims that his trial counsel rendered ineffective assistance by not asking the trial court to hold an ability-to-pay hearing before it imposed two $10,000 restitution fines.  We reject this claim.

"In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (§ 1202.4, subd. (b).)  Under subdivision (b)(1) of section 1202.4, "[t]he restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense.  If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)."  Although "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine," it "may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine." (§ 1202.4, subd. (c).)  In the case of defendants, like Sims, whose sentences include a period of parole, a parole revocation restitution fine "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4" must also be imposed. (§ 1202.45, subd. (a).)

At sentencing, the trial court imposed a restitution fine of $10,000 under section 1202.4, subdivision (b), and imposed and suspended a parole revocation restitution fine of $10,000 under section 1202.45, subdivision (a). It also imposed an order of $9,180.01 in direct victim restitution, which was "joint and several with the co-defendants Mr. Harbin, Mr. Stills, Mr. Davis,

31

Mr. Ward[,] and Ms. Reed." Sims did not object to the imposition of the fines. In addition, he declined when asked whether he wanted a hearing on the amount of the direct restitution award.

As we have said, to prevail on a claim of ineffective assistance of counsel, a defendant must show both that "counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing norms" and that there was "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mai, supra*, 57 Cal.4th at p. 1009.) On direct appeal, we reverse only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Ibid.*)

Sims argues that there could have been no "reasonable basis" for his counsel's failure to object to the $10,000 fines and requesting an ability-to-pay hearing, because "[t]he record in this case makes clear that [he] lacks the ability to pay." Sims points out that the probation report stated he was unemployed, had never been "formally employed," had no assets, and had received Supplemental Security Income as a minor, as well as "general assistance benefits for a short period." In addition, he says that "[f]or the foreseeable future, [his] only possible source of income [will] be prison wages," which amount to $12 to $56 per month. Given his responsibility for paying the direct victim restitution award as well, he argues that it is "unclear when, if ever, [he] would be able to *begin* payment of the $10,000 restitution fine [under section 1202.4, subdivision (b)], let alone when he would be able to pay it off."

On this record, Sims cannot demonstrate that his trial counsel's performance was deficient. It is possible that there was no objection to the amount of the restitution fine because counsel knew Sims could, in fact, afford it. This possibility alone defeats his claim. In addition, even if Sims was unable to pay $10,000, his counsel could have rationally decided not to object. Ability to pay is merely one factor the trial court "may" consider in setting the amount of the restitution fine (§ 1202.4, subd. (c)), and the fact that a prisoner might have serious difficulty ever paying it does not preclude imposition of the maximum amount where, for example, the crime is especially serious. (See *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.) As discussed above, Sims received favorable sentencing treatment because he took responsibility for his role in Pierce's murder. Especially since he declined to challenge the amount of direct victim restitution, it could have been a rational tactical choice to accept the maximum restitution fine to further acknowledge the gravity of the offense.

## III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.

WE CONCUR:


_____

Banke, J.


_____

Sanchez, J.

*People v. Sims*  A155339